ACCEPTED
14-15-00178-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
9/23/2015 5:35:28 PM
CHRISTOPHER PRINE
CLERK

# NO. 14-15-00178-CV

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
9/23/2015 5:35:28 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE FOURTEENTH COURT OF APPEALS
## HOUSTON, TEXAS

### PRESBYTERY OF NEW COVENANT, INC.,
*Appellant*,

### v.

### FIRST PRESBYTERIAN CHURCH OF HOUSTON,
*Appellee*.

On Appeal from the 234th District Court, Harris County, Texas
Trial Court Cause No. 2014-30354

# BRIEF OF APPELLEE

**SUSMAN GODFREY L.L.P.**
Thomas W. Paterson
State Bar No. 15571500
tpaterson@susmangodfrey.com
1000 Louisiana St., Suite 5100
Houston, TX 77002
(713) 651-9366
(713) 654-6666 (FAX)

**BECK REDDEN LLP**
David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
Erin H. Huber
State Bar No. 24046118
ehuber@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

*Counsel for Appellee First Presbyterian Church of Houston*

## IDENTITY OF THE PARTIES

In addition to the counsel identified in the Brief of Appellant, please note the appearance of additional counsel for Appellee:

Erin H. Huber
State Bar No. 24046118
ehuber@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

# TABLE OF CONTENTS

**Page**

IDENTITY OF THE PARTIES ................................................................. i

TABLE OF CONTENTS ....................................................................... ii

INDEX OF AUTHORITIES..................................................................v

STATEMENT OF THE CASE ............................................................... xi

STATEMENT REGARDING ORAL ARGUMENT ........................................ xii

ISSUES PRESENTED...................................................................... xiii

STATEMENT OF FACTS....................................................................1

SUMMARY OF THE ARGUMENT ........................................................17

ARGUMENT ................................................................................18

    I.    FIRST PRESBYTERIAN OWNS THE CHURCH PROPERTY FOR ITSELF. ...........................................................................18

        A.    Neutral principles of law are applied in resolving church property disputes. ......................................................18

        B.    First Presbyterian does not hold any property in trust. .............20

            1.    A trust requires intent by the settlor to create a trust. ...........................................................................20

            2.    The deeds, the corporate documents for First Presbyterian, and the governing documents for the PCUS/PCUSA establish that there is no trust imposed on the property. ......................................22

                *a.*    *The deeds do not create any trust.* ......................22

                *b.*    *First Presbyterian's corporate documents do not create any trust.*.......................................25

          *c.*     *No provision in the governing documents of PCUS or PCUSA creates a trust in PCUSA.*.................................................27

  C.   PNC's arguments regarding paragraph 158 of the PCUS Book of Church Order and its successors fail. ..............32

      1.     Paragraph 158 and its successors are dissolution clauses, not trust clauses. ................................................32

      2.     First Presbyterian's renewal of its charter in 1938 is not evidence of intent to create a trust. ..............35

      3.     The "dissolution clause" is in any event inapplicable to a thriving local church such as First Presbyterian. ..........................................36

          *a.*     *The ordinary meaning of the language applies.* ................................................36

          *b.*     *A local church is not dissolved and does not cease to exist merely because of strained or severed relations with a denomination.* ........................................38

II.   THE PROPERTY ISSUE IS JUSTICIABLE...................................41

  A.   The general rule allows courts to resolve property cases by applying neutral principles. .........................................41

  B.   The general rule has an exception............................................42

  C.   The narrow exception to neutral principles—for cases where "*ecclesiastical decisions effectively determine*" property rights—is inapplicable................................................43

      1.     The GRD process does not cover property disputes. ........................................................43

      2.     Even if applicable, the GRD process was not abandoned. ................................................47

III. THE ANCILLARY INJUNCTION IS VALID. ...............................................50

    A.    The trial court permissibly supported its declaratory judgment with ancillary injunctive relief, as authorized by statute. ...............................................50

    B.    The PNC's objections to the injunctive relief are unpersuasive. ...............................................53

PRAYER FOR RELIEF ...............................................58

CERTIFICATE OF SERVICE ...............................................59

CERTIFICATE OF COMPLIANCE ...............................................60

# INDEX OF AUTHORITIES

**CASES**                                                **Page(s)**

*Best Inv. Co. v. Hernandez*,
479 S.W.2d 759 (Tex. Civ. App.—
Dallas 1972, writ ref'd n.r.e.)................................................................22

*Brown v. Clark*,
102 Tex. 323, 116 S.W. 360 (1909) ............................................19, 23

*Carrollton Presbyterian Church
v. Presbytery of South Louisiana of
Presbyterian Church (USA)*,
77 So. 3d 975 (La. App. 2011) ...........................................49, 51, 52, 57

*Christensen v. Roumfort*,
20 Ohio App. 3d 107 (1984)............................................................37, 38

*Christopher v. Davis*,
284 S.W. 253 (Tex. Civ. App.—
Dallas 1926, writ ref'd)..................................................................21

*City of Austin v. Cahill*,
99 Tex. 172, 88 S.W. 542 (1905) ................................................21, 33

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) ...........................................................37

*Clayton v. Ancell*,
168 S.W.2d 230 (Tex. Comm'n App.
1943, opinion adopted) ..................................................................22

*Dulin v. Moore*,
96 Tex. 135, 70 S.W. 742 (1902) ................................................21, 35

*The Episcopal Diocese of Fort Worth
v. The Episcopal Church*,
422 S.W.3d 646 (Tex. 2013) .........................................................19

*First & Calvary Presbyterian Church*
  *v. John Calvin Presbytery*,
  Case No. 1531-CC00924, Circuit Ct.
  Greene Cty., Mo..................................................................................1

*First Presbyterian Church of Greenwood,*
  *Inc. v. Presbytery of St. Andrew,*
  *Presbyterian Church U.S.A., Inc.*,
  Cause No. G15-0064, Chancery Ct.
  Leflore Cty., Miss. ...............................................................................1

*First Presbyterian Church PCUSA of*
  *Starkville, Miss. v. Presbytery of St.*
  *Andrew, Presbyterian Church U.S.A., Inc.*,
  Cause No. 2015-0151-D, Chancery Ct.
  Oktibbeha Cty., Miss. ...........................................................................1

*First Presbyterian Church of*
  *Schenectady v. United Presbyterian*
  *Church in the United States*,
  62 N.Y.2d 110, *cert. denied*,
  469 U.S. 1037 (1984)......................................................................38, 48

*First Presbyterian Church of Wichita Falls*
  *v. Palo Duro Presbytery*,
  Cause No. 182,783-B, 788th Jud. Dist. Ct.,
  Wichita Cty., Tex..................................................................................1

*Fitz-Gerald v. Hull*,
  150 Tex. 39, 237 S.W.2d 256 (1951) ...................................................21

*General Convention of the New Jerusalem in the*
  *United States of America, Inc. v. MacKenzie*,
  449 Mass. 832 (2007) ..........................................................................39

*Gillette v. United States*,
  401 U.S. 437 (1971)........................................................................55, 56

*Hernandez v. Commissioner of Internal Revenue*,
  490 U.S. 680 (1989)..............................................................................57

*Highland Park Presbyterian Church Inc.
v. Grace Presbytery, Inc.*,
2013 WL 5538716 (N.D. Tex. Oct. 7, 2013)..........................................................1

*Highland Park Presbyterian Church Inc.
v. Grace Presbytery, Inc.*,
No. 13-10605, in the 298th Judicial District Court
of Dallas Cty., Tex...............................................................................................52

*Hope Presbyterian Church of Rogue River
v. Presbyterian Church (U.S.A.)*,
291 P.3d 711 (Or. 2012) ....................................................................................25

*Hosanna-Tabor Evangelical Lutheran Church
and School v. EEOC*,
132 S.Ct. 694 (2012).........................................................................................56

*Hotchkiss v. Nat'l City Bank of N.Y.*,
200 F. 287 (S.D.N.Y. 1911)...............................................................................37

*Jones v. Wolf*,
443 U.S. 595 (1979)..............................................................14, 19, 27, 41

*Lacy v. Bassett*,
132 S.W.3d 119 (Tex. App.—Houston
[14th Dist.] 2004, no pet.)...........................................................................18, 41

*Lakeside Realty, Inc. v. Life Scape
Homeowners Ass'n*,
202 S.W.3d 186 (Tex. App.—Tyler
2005, no pet.) .....................................................................................................50

*Masterson v. The Diocese of Northwest Texas*,
422 S.W.3d 594 (Tex. 2013) ....................................................................*passim*

*McMurray v. Stanley*,
69 Tex. 227, 6 S.W. 412 (1887) .......................................................................23

*Mead v. Randolph*,
8 Tex. 191 (1852)................................................................................................1

*Meyers v. Baylor Univ. in Waco*,
6 S.W.2d 393 (Tex. Civ. App.—
Dallas 1928, writ ref'd)................................................20, 33

*Monday v. Vance*,
92 Tex. 428, 49 S.W. 516 (1899) ...........................................1

*New Covenant Presbyterian Church, Inc.*
*v. The Presbytery of S. La. of the*
*Presbyterian Church (USA)*,
Suit No.: 602832, § 27, 19th Jud. Dist. Ct.,
E. Baton Rouge Parish, La.....................................................1

*North East Texas Motor Lines, Inc. v. Dickson*,
148 Tex. 35, 219 S.W.2d 795 (1949) ...................................53

*Ohio Civil Rights Comm'n v. Dayton*
*Christian Schools, Inc.*,
477 U.S. 619 (1986).........................................................55, 56

*Peters Creek United Presbyterian Church*
*v. Washington Presbytery of Penn.*,
90 A.3d 95, 110 (Pa. Commw. Ct. 2014) ............................25

*Phillips Petroleum Co. v. Gillman*,
593 S.W.2d 152 (Tex. Civ. App.—
Amarillo 1980, writ ref'd n.r.e.) ........................................37

*Phillips v. Sherman*,
39 S.W. 187 (Tex. Civ. App. 1897, no writ) .......................22

*Pottorff v. Stafford*,
81 S.W.2d 539 (Tex. Civ. App.—
El Paso 1935, writ ref'd)......................................................21

*Presbyterian Church in United States*
*v. Hull Memorial Presbyterian Church*,
393 U.S. 440 (1969).............................................................41

*Samuell v. Brooks*,
   207 S.W. 626 (Tex. Civ. App.—
   Dallas 1918, writ ref'd)...................................................................................21

*Sherman Gin Co. v. Planters Gin*
   *Co., Inc. of Indianola*,
   599 S.W.2d 348 (Tex. Civ. App.—
   Texarkana 1980, writ ref'd n.r.e.).......................................................................1

*State v. Anderson Courier Serv.*,
   222 S.W.3d 62 (Tex. App.—Austin
   2005, pet. denied)...............................................................................................50

*Tanglewood Homes Ass'n, Inc. v. Feldman*,
   436 S.W.3d 48 (Tex. App.—Houston
   [14th Dist.] 2014, pet. denied) ...........................................................................50

*Tara Partners, Ltd. v. City of S. Houston*,
   282 S.W.3d 564 (Tex. App.—Houston
   [14th Dist.] 2009, pet. denied) ...........................................................................50

*Texas West Oil & Gas Corp.*
   *v. El Paso Gas Transp. Co.*,
   631 S.W.2d 521 (Tex. App.—El Paso
   1982, writ ref'd n.r.e.).......................................................................................37

*Toledo Soc. for Crippled Children v. Hickok*,
   261 S.W.2d 692 (Tex. 1953) ..............................................................................19

*United States v. Seeger*,
   380 U.S. 163 (1965)......................................................................................55, 56

*Wheeler v. Haralson*,
   128 Tex. 429, 99 S.W.2d 885
   (Tex. Comm'n App. 1937, opinion adopted) ......................................................20

*Windwood Presbyterian Church, Inc.*
   *v. Presbyterian Church (U.S.A.)*,
   438 S.W.3d 597 (Tex. App.—Houston
   [1st Dist.] 2014, no pet.) ....................................................................................34

*Wise v. Haynes*,
   103 S.W.2d 477 (Tex. Civ. App.—
   Texarkana 1937, no writ)................................................................22, 28, 33


**STATUTES**

TEX. BUS. ORGS. CODE
   § 1.002(36)..........................................................................................25
   § 3.005................................................................................................25
   § 3.101................................................................................................25
   § 22.102..............................................................................................25
   § 22.164................................................................................................1
   § 22.301................................................................................................1
   § 22.302................................................................................................1
   § 22.305................................................................................................1

TEX. CIV. PRAC. & REM. CODE
   § 37.011..............................................................................................50

TEX. PROP. CODE
   § 111.004(4)...................................................................................20, 33
   § 111.004(14)......................................................................................20
   § 112.001............................................................................................20
   § 112.002............................................................................................21
   § 112.051(a)........................................................................................29

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (7th ed.) ....................................................38

MERRIAM-WEBSTER DICTIONARY ........................................................38

RESTATEMENT (FIRST) OF TRUSTS
   § 17 (1935)..........................................................................................20
   § 23 (1935)..........................................................................................21

RESTATEMENT (THIRD) OF TRUSTS
   § 2 cmt. i (2003).................................................................................24
   § 41 cmt. b (2003)..............................................................................24

## STATEMENT OF THE CASE

*Nature of the case*  This case involves church property. The two sides disagree about whether a local church owns its property outright, as opposed to the property being owned in trust for the denomination.

The two sides are a local church (First Presbyterian Church of Houston) and a regional entity (Presbytery of New Covenant, Inc. ("PNC")) of the denomination, Presbyterian Church (U.S.A.) ("PCUSA").

*Trial court*  Hon. Wesley Ward,
234th Judicial District Court, Harris County

*Course of proceedings*  First Presbyterian requested a declaratory judgment that its property belongs to it—free and clear—with no trust obligations to any other entity. First Presbyterian moved for summary judgment on the basis of the relevant deeds and other papers, pursuant to *Masterson v. The Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013).

Presbytery of New Covenant, Inc. argued that (1) civil courts cannot hear the case, and (2) the legal papers in fact impose a trust on the property.

*Trial court disposition*  The trial court first addressed justiciability. The court conducted a hearing on a plea to the jurisdiction and held the case justiciable. CR 2460-61.

Then the court granted summary judgment on the merits, holding that First Presbyterian owns its property free and clear, and that the property is not subject to a trust. CR 4452-64.

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. The Court can readily resolve the issues based purely on the stipulations and documentary record.

## ISSUES PRESENTED

The judgment declares that First Presbyterian Church owns its property in unfettered fee simple—*i.e.*, not in trust for Appellant. The judgment then prohibits Appellant from taking acts "to assert ownership" to the property or "affect the property rights of First Presbyterian Church of Houston."

Appellant has presented three issues:

    1.    Was the property question answered correctly on the merits?

    2.    Is the property question justiciable?

    3.    Is the injunctive component of the judgment unconstitutional?

## STATEMENT OF FACTS

This case presents a dispute about property rights. It calls on the courts to read a number of documents and to decide who owns what—specifically, to decide whether First Presbyterian owns its property in trust for the denomination. Some of the documents may be difficult to read because of their age and because they are handwritten. Worse, the district clerk's office prepared a flawed clerk's record, with low-quality photocopies and an unreliable index.

Happily, the parties and the attorneys on both sides respect each other highly and have worked well together in gathering the materials for the appeal. The parties simplified the case by stipulating to dozens of facts. CR 2462-70. The parties also agreed to admission of essentially all significant documents, such as deeds and corporate charters. CR 2477-78. There is no dispute about what the key documents say; the dispute is about their legal effect.

Appellant's opening brief has a lengthy statement of facts. *See* PNC Br. at 1-12. That statement of facts contains many accurate assertions, but a few of its claims are unsupported by citations, and a few go further than the record will fairly support. Although this is no time to be contentious or hypertechnical, we respectfully cannot acquiesce in all the assertions made there. As a result, it may be best to begin with some common ground. We will walk through the facts to which the two sides stipulated.

*The stipulations set out many of the facts*

The parties stipulated to 61 facts. CR 2464-68. They agreed that these facts may be used "throughout the pendency of this lawsuit." CR 2462.

1. Plaintiff First Presbyterian Church of Houston ("FPC") is a non-profit corporation organized under the laws of the State of Texas.

2. Plaintiff FPC's domiciliary address is 5300 Main Street, Houston, Texas 77004.

3. Defendant Presbytery of New Covenant, Inc. ("Presbytery") is [a] non-profit corporation organized under the laws of the State of Texas.

4. Defendant Presbytery's domiciliary address is 1110 Lovett Blvd., Houston, Texas 77006.

5. FPC has been incorporated since January 4, 1887.

6. Before its incorporation, FPC had existed as an unincorporated association of Presbyterian church members since the congregation's organization on March 31, 1839.

7. At the time of FPC's founding, Texas was not yet a state, and FPC was organized as an affiliated congregation of the "Presbyterian Church in the United States of America."

8. After Texas's accession into the United States, that denomination would later divide along Civil War boundaries in the 1860's to eventually become the northern "United Presbyterian Church in the United States of America" ("UPCUSA") and the southern "Presbyterian Church in the United States" ("PCUS").

9. FPC followed the southern PCUS denomination until June 10, 1983, when the PCUS formally reunited with the UPCUSA to form the Presbyterian Church (U.S.A.) ("PCUSA").

10. FPC has been affiliated with the PCUSA denomination since that date.

11. Defendant Presbytery is a district administrative unit of the PCUSA.

12. Presbytery's membership includes approximately 96 local Presbyterian congregations in 29 Texas counties.

13. Presbytery is one of approximately 173 such geographically-organized presbyteries in the PCUSA.

14. Under the governing constitution of the PCUSA, the local presbytery is responsible for waiving or seeking enforcement of any trust claim of the denomination against a local congregation.

15. The different administrative units in the PCUSA denomination are variously called "courts," "councils," or "governing bodies."

16. PCUSA courts are of four types, each of widening geographic scope: sessions, presbyteries, synods, and the General Assembly.

17. Individual Presbyterian congregations operate through their sessions, which are comprised of members of the congregation elected as "elders" to govern and act on behalf of the congregations.

18. Approximately 173 regional PCUSA presbyteries oversee the spiritual and moral life of local congregations.

19. PCUSA presbyteries are in turn overseen by the 16 geographically-organized synods.

20. The PCUSA General Assembly is a body that convenes every other year and operates on a national level.

21. The PCUSA General Assembly reviews the work of synods, addresses spiritual controversies, and otherwise performs those acts delegated to it by the PCUSA Constitution.

22. The PCUSA Constitution is the governing document of the PCUSA.

23. The PCUSA Constitution is divided into two parts: (1) Part 1 – the *Book of Confessions*, and (2) Part 2 – the *Book of Order*.

24. The *Book of Order* was called the *Book of Church Order* in the PCUS.

25. In 1983, the southern PCUS denomination merged with the northern UPCUSA denomination to form the PCUSA.

26. The PCUSA "Articles of Agreement" formally created the PCUSA from the merger of the PCUS and UPCUSA denominations. DX 1 at Appendix A.[1]

27. In 1991, FPC held a vote whether to seek dismissal from PCUSA. At the FPC congregation meeting on March 17, 1991, the total votes to request dismissal was 760 (or 37%), and the total votes not to request dismissal was 1,296. DX 17.

28. Presbytery adopted its ["]Gracious Reconciliation and Dismissal Procedure" ("GRD Procedure") (DX 38) in December 2011. DX 20. Seven members of FPC served as commissioners at the Presbytery meeting at which the GRD Procedure was approved and adopted, and FPC minister Rev. James T. Birchfield also attended the meeting.

29. Following years of disagreement with the PCUSA over a variety of issues, on January 8, 2013, the FPC Session recommended that the congregation enter into the Presbytery's "Gracious Reconciliation and Dismissal Procedure") ("GRD Procedure"). PX 13.

30. At a meeting of the congregation on January 27, 2013, the church membership agreed and voted to enter into the Procedure. DX 24.

---

[1] The exhibits referenced in the stipulations are those filed in connection with First Presbyterian's application for a temporary injunction and the PNC's opposition. *See* CR 1561-64, 1639-46.

31. FPC conducted a number of town hall meetings during the discernment process, including conducting a "Learning Journey" regarding property issues. Presbytery General Presbyter Mike Cole attended a number of the informational meetings at FPC.

32. After a year-long process under the GRD Procedure, the congregation of FPC voted on whether to request dismissal on February 23, 2014. Mike Cole attended the vote.

33. The congregation voted in favor of dismissal, 1085 to 596. PX 15.

34. The congregation's dismissal vote fell short of the super-majority vote required to request dismissal under the GRD Procedure.

35. FPC owns approximately thirteen parcels of real property, all in the Houston, Texas area.

36. The face of the official deeds recorded in the Harris County property records do not indicate that any of the properties owned by FPC were conveyed to the church to hold in trust for the benefit of the Presbytery, the PCUS, or the PCUSA. PX 16 and PX 17.

37. In one known instance, in 1843, FPC purported to limit its ownership rights or acquire property for the benefit of a denomination in a deed.

38. Paying $1 for the tract of land on which FPC had already been allowed to erect its first church building, FPC's trustees acquired the land "for the sole use and benefit of the Presbyterian denomination, adhering to the Westminster Confession of Faith."

39. On information and belief, the only such denomination at the time of this instrument would have been the "Presbyterian Church in the United States of America."

40. The Presbyterian Church in the United States of America ceased to exist as an entity in 1861.

41. The referenced property was sold by FPC in 1894.

42. Since 1837, FPC has obtained the deeds to real property in its own name.

43. FPC is a not-for-profit corporation whose sole purpose outside of religious worship is the spiritual, moral, and emotional edification of its members and non-members within its sphere of influence.

44. FPC is highly dependent upon continuity of membership, leadership, and fellowship.

45. FPC is dedicated exclusively to serving those in spiritual and physical need.

46. Among the ministries and philanthropic causes which depend on FPC are many that are dedicated to bettering the lives of people in the city of Houston, the state of Texas, and even in other countries throughout the world.

47. One ministry supported almost exclusively by FPC is The Nehemiah Center, a resource center organized to "offer[] academic, emotional, cultural, social and spiritual enrichment for at-risk children and their families in Houston's Third Ward and beyond."

48. One specialty program within the umbrella of The Nehemiah Center is Mommy and Me, a program dedicated to targeting "word poverty," the tremendous and crippling gap in language development seen in impoverished families.

49. The Nehemiah Center's Academic Enrichment Program provides inner-city children between kindergarten and fifth grade with the personalized homework instruction, reading and math remediation, and mentoring that are critically important to later scholastic success.

50. Another Nehemiah Center initiative, the College Prep Program, offers advanced academic tutoring and preparation for college entrance exams and admissions decisions.

51.	Among the Family Service Programs also offered by the Nehemiah Center are adult education classes, computer literacy instruction, financial responsibility training, entrepreneurial workshops, English as a second language (ESL) assistance, parenting seminars, life skills workshops, mental health fairs, and a Father-and-Son Camp.

52.	The philanthropic services offered above serve hundreds of Houston residents every year.

53.	Another ministry that is almost exclusively dependent upon FPC is Main Street Ministries, which itself administers or supports three more programs.

54.	One Main Street Ministries program, Operation ID, is an organization formed to help Houston's homeless, indigent, and recently-released prisoners obtain the vital documents needed to integrate into modern society.

55.	Another Main Street Ministries program, The Shepherd's Center, operates a crisis service for those facing financial need and unemployment.

56.	Holy Ground is an FPC-supported ministry dedicated to physically and spiritually feeding Houston's impoverished and hungry.

57.	Main Street Ministries devoted more than $930,000 to supporting its programs last year alone.

58.	Other ministries and causes supported by FPC include Bridges International (a student organization which helps international students integrate through service activities, social networking, and spiritual involvement); African Renewal Ministries (a ministry initiative aimed at training and transforming African leaders); The Micah Project (a charter organization of Honduran children's homes); Hillcrest AIDS Centre (a South African comprehensive AIDS outreach program); Millennium Relief and Development (an international catastrophe support service); and Cullen Middle School (a Houston school boasting a 92 percent rate of student economic disadvantage).

59. FPC's leadership expressed disappointment, but upheld the vote.

60. During the GRD Procedure, FPC was informed that the Presbytery would not dismiss the church without an additional "voluntary" payment, not set forth in the GRD Procedure, that was related to the value of FPC's property.

61. FPC has contributed $9.6 million to the PCUSA or its predecessor denomination since 1968.

CR 2464-68. As stipulation 36 notes, all the relevant deeds in the Harris County real property records identify First Presbyterian as the landowner, with no mention of a trust. So if a trust exists, it must have come about from elsewhere.

### *First Presbyterian Has Never Created or Accepted a Trust on this Land*

First Presbyterian, which began in 1839, was incorporated as a Texas non-profit corporation in 1887. CR 2743. From those days all the way to the 1980s, there was no trust clause in the constitution of the various Presbyterian denominations with which First Presbyterian has been affiliated.

In 1982, the PCUS (the Southern denomination) unilaterally put a trust clause in its Book of Church Order. CR 2697. That clause (known as § 6-3 in the 1982/83 PCUS Book of Church Order) announced that all property held by a local church "is held in trust nevertheless" for the benefit of the PCUS. *Id*. However, First Presbyterian never voted for, approved, or otherwise consented to that trust relationship. CR 2702-13.

In 1983, the PCUS merged with the UPCUSA (the Northern denomination) to form the PCUSA. CR 2464. The new PCUSA constitution contained a trust clause and an additional provision forbidding local churches to buy, sell, mortgage, or encumber real property without the permission of the presbytery. CR 1758-59; 2700, 3774.

Meanwhile, to make the merger more attractive, denominational authorities promised local churches that there would be a "grandfather" provision so that historical property rights would not be compromised. CR 2759-60. Thus, the new PCUSA constitution contained an "opt out" clause. CR 2701, 3775.

First Presbyterian took this opportunity to make crystal clear that the merger would not be used as a basis to alter its long-standing property rights. First Presbyterian's Session recommended that the congregation pass a resolution rejecting any hint of a trust arrangement. CR 2702-12. The congregation promptly did so. CR 2713. The PNC did not agree with this development, but it acknowledged it. CR 2967-68.

Matters came to a head after the Supreme Court's decision in *Masterson v. The Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013). After that opinion, First Presbyterian acted to reiterate its unwavering rejection of any trust arrangement. First Presbyterian again rejected any trust in favor of any

denominational beneficiary, and its Session adopted a resolution stating that it "strenuously denies the creation of a trust of any kind." CR 3070-73.

The PNC's top official recognized *Masterson* as what could be called the writing on the wall for those who wanted to impose a trust by unilateral actions:

> The effect of the Texas Supreme Court decision was to strike down the trust clause. What they said was that unless a congregation has in their bylaws and articles of incorporation a clause that specifically states that there is an irrevocable trust for the denomination, the trust clause in our BOO [Book of Order] is unenforceable. That … puts the presbytery in an untenable position legally.

CR 3013.

Meanwhile, First Presbyterian took additional steps to reiterate its rejection of any trust. In late 2014, the church's Session amended its corporate bylaws to provide for the disposition of all corporate assets in the event of any future dissolution. CR 3074-75.

### First Presbyterian Went Through the GRD Process

The preceding chronology deals with the issue of property ownership. But in the past several years, there have also been developments on a different track, involving the issue of the First Presbyterian / PNC **relationship**.

In 2011, the PNC fashioned a plan for addressing the relationship between a local church and the denomination. It calls this the Gracious Reconciliation and Dismissal Procedure. CR 1422-34. The GRD process provides a framework for a local church to use in answering the question: Should we stay or should we go?

On January 8, 2013, First Presbyterian's Session recommended that the congregation enter into the GRD process. CR 2466. At a meeting of the congregation on January 27, 2013, the church membership agreed and voted to do so. *Id.* First Presbyterian and the PNC then agreed in writing to go through the GRD process. They did this by signing a one-page agreement entitled "Covenant Agreement." That agreement commits the two sides to follow the GRD procedure "and abide by its terms as a way of discerning God's will for the relationship between the congregation and the Presbytery of New Covenant." CR 1466.

Stipulations 29 through 34 relate what happened next, over the course of a full year. *Id.* The PNC and First Presbyterian formed a group called the Discernment Team, with four representatives from each side, per page 4 of the GRD process. They held the various meetings and town-hall assemblies called for by pages 4 and 5 of the GRD process. They talked and listened to each other.

In the end, the congregation came together for a vote on the relationship question—Should we stay or should we go? On February 23, 2014, a majority voted to go. *Id.* The vote was 1085 to 596. *Id.* But that 64.5 percent outcome fell just 36 votes short of the required two-thirds referred to on page 7 of the GRD process. Clause 4 of that page states that if at least two-thirds of those voting request dismissal from the denomination, "the Presbytery shall agree to the dismissal, permitting the congregation to depart with all of its property intact."

CR 1428. It then provides for a contribution schedule for the congregation to make to the denomination over the next five years after its departure (*i.e.*, "dismissal") from the denomination. *Id*.

But because the vote did not reach two-thirds, there was no dismissal. CR 2466. The congregation did not go; it stayed, and it has done so ever since. As stipulation 59 observes, First Presbyterian's leadership was disappointed but "upheld the vote." CR 2468.

The Session then prepared a covenant of reaffirmation and met with the Discernment Team to discuss it, pursuant to the GRD procedure. 3 RR 181-82. The process had taken just over a year, in keeping with the timeline provided for on page 4 of the GRD procedure: "this process should take no less than six months and no more than two years." CR 1425.

### *This declaratory judgment action*

On May 29, 2014, First Presbyterian asked the courts to resolve the trust issue once and for all. CR 11. Its petition sought "a final adjudication of its property rights as currently held by the congregation of FPC, regardless of its denominational affiliation." CR 22. The petition also requested a temporary restraining order and a temporary injunction to preserve the status quo. CR 46. Contemporaneous with filing this suit, the court granted the restraining order and set the injunctive request for a hearing. CR 485, 1570.

A few days later, First Presbyterian filed a 32-page memorandum of legal arguments to show a probable right to relief. CR 488-519. It included an affidavit from Professor Stanley Johanson, who teaches trust law at the University of Texas Law School. CR 520-42. Professor Johanson examined a spectrum of documents from the 1800s to the present, such as the church's minutes, its corporate charter, the deeds to the properties, and the denomination's governing documents. Although his affidavit is long, his opinion can be reduced to a nutshell: (1) a trust comes about only as a matter of the settlor's clear intent, and (2) the documents show no such intent on the part of First Presbyterian.

"Based on my examination of the relevant documents, it is my conclusion that at no time in the history of FPC has its Articles of Incorporation, or any other official FPC document, contained any provision creating or establishing a blanket trust, express or implied, in favor of a national denomination upon the property held by or for the local church or its civil corporation." CR 542. "Applying generally applicable principles of Texas trust law, it is my opinion that no valid, legally cognizable trust of any kind arises from the [various documents] in favor of the PCUS, PCUSA or Presbytery of New Covenant with respect to any property held by or for FPC." *Id.*

The PNC opposed the request for injunctive relief and filed a plea to the jurisdiction. CR 621, 629. The court heard extended arguments on the plea to the jurisdiction. 2 RR 5-110. A day later, the court had a hearing on the request for temporary injunctive relief. 3 RR 9-301. The court admitted many exhibits and took live testimony from six witnesses, including Professor Johanson and the Presbytery's top official, Reverend Mike Cole.

At the end of the hearing, the court stated: "*Masterson* and *Jones v. Wolf* provide for this case to be decided under neutral principles, and it can be decided under neutral principles without any und[ue] entanglement in ecclesiastical issues. Therefore, at this time, I'm inclined to deny defendant's plea to the jurisdiction. But I am going to review some things before I decide." 3 RR 299-300. "I also, in looking through the GRD and the arguments that are made in the brief concerning the GRD as it relates to potential or arbitration or ADR or contract or something like that, as a grounds to abate or dismiss the case, I'm – I'm leaning to deny that motion." 3 RR 300. The next day, the court granted the temporary injunction (CR 2457) and denied the plea to the jurisdiction. CR 2460, 2461.

Following extensive discovery, First Presbyterian moved for summary judgment. CR 2789. On February 16, 2015, the court held a hearing on the motion. *See* SJ hearing RR 1-31. First Presbyterian asked for a declaration about ownership of the property. *Id.* at 6. "The relevant issue before you," First

Presbyterian argued, "really has nothing to do with denominational affiliation. The issue before you here relates to property; property that is held in FPC's name, that was paid for exclusively by FPC, and it was purchased solely for the benefit of First Presbyterian Church. To rule on the motion before you, the Court doesn't need to interpret or apply any religious doctrine." *Id.* at 6-7.

The PNC responded by arguing three points: (1) express trust, (2) waiver, and (3) ratification. *Id.* at 19. The second and third points play no role in the appeal and need not be discussed further. On the express trust point, something curious occurred. For decades, the PCUSA and its local presbyteries had relied on the express trust provision in the Book of Order (G-4.0203) to argue that local churches held their property in trust for the denomination. *See* CR 2700, 3774. Now, after *Masterson*, the PNC abandoned the trust clause and was forced to glean the Book of Order to search for a provision, any provision, that might support its trust theory. At summary judgment, the PNC argued that First Presbyterian tacitly agreed to a trust arrangement because of a clause in the 1925 PCUS Book of Church Order. SJ hearing RR 22-25.

The 1925 PCUS Book of Church Order refers to property going to the Presbytery if a church should be "dissolved by the Presbytery, or otherwise cease to exist." CR 4279. The PNC argued that being "dissolved" does not have the meaning it would have for a corporation. SJ hearing RR 23. "Dissolution is a term of art." *Id.*

997.115/567149                    15

According to the PNC's legal argument, a church is dissolved and ceases to exist if it leaves the denomination. "A dissolution is meant in that sense, not in some corporate sense." *Id.* at 24. In other words, "if you leave the denomination, and you and the Presbytery haven't worked out a way to deal with your property, then the Presbytery gets the property." *Id.*

The court granted First Presbyterian's motion. CR 4452-64. It declared the property free of any trust interest. *Id*. The PNC appealed. CR 4472. The legal arguments in the PNC's brief are discussed later, but one of its factual assertions may deserve particular mention so that the Court does not take it as true. Page 1 of the PNC brief quotes from the 1843 deed. The brief then says, "From this seed grew today's First Presbyterian Church of Houston. First Presbyterian sold that original property to buy its second property and so on through the present day." Br. at 1.

The 1843 deed, however, did not involve any of the 13 tracts at issue here. The church sold that tract in 1894, as the parties stipulated, and there is no overlap or connection between the land covered by the 1843 deed and the 13 tracts of land at issue here. CR 2466-67.

## SUMMARY OF THE ARGUMENT

**1. Property.** The trial court applied neutral principles of law, as required by *Masterson v. The Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013). After examining the relevant materials, the court found that they do not create a trust over First Presbyterian's property. A trust is a matter of the settlor's intent, and nothing indicates such intent on the part of First Presbyterian. Appellant relies on a 1925 clause that addresses situations where a local church is "dissolved" or "ceases to exist," but neither of those situations exists here.

**2. Justiciability.** The court correctly found the case justiciable. As a rule, courts have jurisdiction to decide church property disputes. There is an exception for cases in which the property question is too closely connected to ecclesiastical issues, but that exception does not apply. Although Appellant says that the parties agreed to resolve their property disputes through an ecclesiastical process known as the GRD procedure, that is inconsistent with the record. The parties agreed to use the GRD procedure only for determining their relationship, not for adjudicating disputed issues of title to property.

**3. Injunction.** The court correctly granted an injunction as ancillary relief. First, the language at issue has been used in prior church property cases. Second, the injunction contains a savings clause to limit its reach, as a way of preventing any constitutional difficulties.

17

# ARGUMENT

The trial court faithfully followed *Masterson v. The Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013). Once *Masterson* was decided, the outcome here was predictable—and Appellant predicted it: "The effect of the Texas Supreme Court decision was to strike down the trust clause." CR 3013. The opinion "puts the presbytery in an untenable position legally." *Id.*

## I. FIRST PRESBYTERIAN OWNS THE CHURCH PROPERTY FOR ITSELF.

Issue 1 raises the question whether the Presbytery of New Covenant, Inc. ("the PNC") holds a trust interest in First Presbyterian's property on behalf of the denomination, PCUSA. The answer is No. Applying neutral principles of Texas law, the trial court ruled correctly that no such trust exists.

### A. Neutral principles of law are applied in resolving church property disputes.

Under the First Amendment, the courts are prohibited from intruding into religious matters, which include "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Masterson*, 422 S.W.3d at 601. On the other hand, courts may and should "review matters involving civil, contract, or property rights even though they stem from a church controversy." *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (quotation omitted). This case involves church property rights.

Texas uses "the neutral principles methodology to determine property interests when religious organizations are involved." *Masterson*, 422 S.W.3d at 607. Under this approach, property ownership is decided by "applying generally applicable law and legal principles." *Id*. at 603. The court rejected the "deference" approach, which defers to and enforces the decision of the highest authority of the ecclesiastical body to which the matter has been carried, determining that *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (1909), followed the neutral principles approach. *See Masterson*, 422 S.W.3d at 602, 604-07.

Thus, "ownership of disputed property is to be determined by considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and bylaws, if any), and relevant provisions of governing documents of the general church." *The Episcopal Diocese of Fort Worth v. The Episcopal Church*, 422 S.W.3d 646, 651 (Tex. 2013). The method is "completely secular in operation" and relies "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." *Jones v. Wolf*, 443 U.S. 595, 603 (1979).

Because this case is about ownership of property, this Court should apply the neutral principles methodology. This means examining Texas trust and corporate law because the property is in Texas. *See Toledo Soc. for Crippled Children v. Hickok*, 261 S.W.2d 692, 696-97 (Tex. 1953).

19

## B. First Presbyterian does not hold any property in trust.

Under Texas law, First Presbyterian owns its property outright and does not own the property in trust for the denomination.

### 1. A trust requires intent by the settlor to create a trust.

A trust is a fiduciary relationship in which one person holds property subject to an equitable obligation to keep or use that property for the benefit of another. *Meyers v. Baylor Univ. in Waco*, 6 S.W.2d 393, 394-95 (Tex. Civ. App.—Dallas 1928, writ ref'd)[2]; *see* TEX. PROP. CODE § 111.004(4). The hallmark of a trust is that legal title and equitable title are separated: legal title is in the trustee, but beneficial title is in the beneficiary. *Wheeler v. Haralson*, 128 Tex. 429, 432, 99 S.W.2d 885, 886 (Tex. Comm'n App. 1937, opinion adopted).

To create a trust, the settlor (the person who wishes to create the trust) transfers property to a trustee or declares that he holds the property for the beneficiary. *See* RESTATEMENT (FIRST) OF TRUSTS § 17 (1935); TEX. PROP. CODE §§ 111.004(14), 112.001. Whether a trust is created before or after the Texas Trust Act of 1943[3], one thing has not changed: intent to create a trust must exist.

---

[2] A "writ refused" history has the force of Supreme Court precedent after June 14, 1927 forward.

[3] The PNC relies on trust law as it existed before enactment of the Texas Trust Act in 1943. Br. at 20 n.7, 27-28. The PNC perceives this law to be more favorable to its case because before 1943: (1) a writing was not required to create a trust, and (2) a trust was presumed to be irrevocable. *See Mead v. Randolph*, 8 Tex. 191, 196-99 (1852); *Monday v. Vance*, 92 Tex. 428, 433, 49 S.W. 516, 518 (1899). But these differences do not matter to the resolution of this case because, as shown *infra* at 20-40, First Presbyterian has never created a trust in favor of PCUS.

The settlor must have intended to create a trust. *City of Austin v. Cahill*, 99 Tex. 172, 189, 88 S.W. 542, 548 (1905) ("plain intention of the parties"); *Christopher v. Davis*, 284 S.W. 253, 257 (Tex. Civ. App.—Dallas 1926, writ ref'd) (same); RESTATEMENT (FIRST) OF TRUSTS § 23 (1935) ("A trust is created only if the settlor properly manifests an intention to create a trust."); *see* TEX. PROP. CODE § 112.002 (same); *see also Fitz-Gerald v. Hull*, 150 Tex. 39, 46, 237 S.W.2d 256, 260 (1951) ("an express trust 'can come into existence only by the execution of an intention to create it by the one having legal and equitable dominion over the property made subject to it.'" (quotation omitted)).

A settlor's intent to create a trust must be "as clearly manifested as if express terms had been employed." *Dulin v. Moore*, 96 Tex. 135, 139, 70 S.W. 742, 743 (1902). The settlor must "employ language which shows unequivocally an intention on his part to create a trust in a third person or to declare a trust in himself." *Samuell v. Brooks*, 207 S.W. 626, 629 (Tex. Civ. App.—Dallas 1918, writ ref'd). This does not mean that a person has to use magic words. *See Pottorff v. Stafford*, 81 S.W.2d 539, 540 (Tex. Civ. App.—El Paso 1935, writ ref'd) ("No particular form of words is required to create the trust, if it is reasonably certain as to the property, its object, and the beneficiary."). But by demanding that intent be "clearly manifested," *Dulin*, 96 Tex. at 139, the courts ensure that the property owner gets to decide what happens to his or her property.

997.115/567149                         21

This rule—that the settlor's intent is paramount—comes with a corollary. Third parties cannot unilaterally impose a trust on someone else's property. *Wise v. Haynes*, 103 S.W.2d 477, 483 (Tex. Civ. App.—Texarkana 1937, no writ) ("declarations of the cestui que trust are not competent to establish the trust."); *Phillips v. Sherman*, 39 S.W. 187, 188 (Tex. Civ. App. 1897, no writ) (same); *see also Best Inv. Co. v. Hernandez*, 479 S.W.2d 759, 763 (Tex. Civ. App.—Dallas 1972, writ ref'd n.r.e.) (same).

### 2. The deeds, the corporate documents for First Presbyterian, and the governing documents for the PCUS/PCUSA establish that there is no trust imposed on the property.

These principles are enough to resolve the legal issue. First Presbyterian proved as a matter of law that there is no trust on its property.

### a. The deeds do not create any trust.

Start with the deeds to the 13 tracts of land. "It is settled in Texas that the presumption of law is that a deed conveys the property therein described to the grantee named in the deed and that he is the owner thereof." *Clayton v. Ancell*, 168 S.W.2d 230, 232-33 (Tex. Comm'n App. 1943, opinion adopted). None of the deeds in the summary judgment evidence shows that FPC currently holds any property in trust for PCUSA. Rather, the deeds establish that FPC owns the property outright.

First Presbyterian owns 13 parcels of real property in the Houston area. CR 2466-67, 2740-42. According to the deeds recorded in Harris County, none of the deeds was conveyed to First Presbyterian to hold in trust for the benefit of PNC, PCUS, PCUSA, or any other denomination. *Id.*; CR 2517-72, 2579-625, 2851-947. A review of the 55 instruments relating to 33 separate properties owned over 175 years shows that First Presbyterian owned or owns those tracts in its name only. *Id.* This means that it has not held the property for the benefit of anyone else. *See Brown v. Clark*, 102 Tex. 323, 343, 116 S.W. 360, 364-65 (1909) ("the church to which the deed was made still owns the property, and that whatever body is identified as being the church to which the deed was made must still hold the title.")

The only arguable exception would be for the 1843 deed. The PNC brief does not put weight on the 1843 deed, but its summary judgment response did, so we will address it to be comprehensive. In 1843, First Presbyterian acquired a specific tract of land for the use and benefit of the "Presbyterian denomination, adhering to the Westminster Confession of Faith." CR 2466, 2655. There are three reasons why this deed does not create a trust for Appellant's benefit.

First, the Appellant (the PNC), the PCUSA, and its predecessors were not clearly identified as a beneficiary, as is required to create a trust. *See McMurray v. Stanley*, 69 Tex. 227, 235, 6 S.W. 412, 416 (1887). The entity referred to in the

1843 deed appears to be a defunct group, the "Presbyterian Church in the United States of America." CR 2466. That group, however, "ceased to exist" in the 1860s. *Id.* Any trust on that tract of land would have run in favor of that entity, but not others.

Second, First Presbyterian sold the property in 1894, terminating any trust that may have been created in 1843. *Id.*; *see* RESTATEMENT (THIRD) OF TRUSTS § 2 cmt. i (2003) ("If a trust is created and subsequently the whole of the trust property ceases to exist, the trust is terminated because the trustee no longer holds anything in trust.").

Finally, 13 tracts at issue in this case have no link to the 1843 tract. The grantor of the 1843 deed had no legal authority to create a trust over all the real property that First Presbyterian owned or might ever own in the future. That person had no right to create a trust on other people's property. *See* RESTATEMENT (THIRD) OF TRUSTS § 41 cmt. b (2003) ("one cannot create a trust of property of which another has sole and complete ownership"). Only First Presbyterian itself, as a settlor creating a trust, could do that.

To put it another way, the owner of Blackacre may well have the right to create a trust over Blackacre when he conveys that tract to the grantee. But he cannot create a trust over Whiteacre, Greenacre, Redacre, and all other lands that the grantee owns (or will ever own in the future).

For these reasons, the 1843 deed to a tract of land no longer owned by the church is not evidence that First Presbyterian currently holds its current property in trust for anyone else.

### b. First Presbyterian's corporate documents do not create any trust.

First Presbyterian's corporate charter and bylaws establish that it does not own its property in trust for PCUSA. The corporate charter and bylaws form the foundational statement of a church corporation's purpose and powers. *See* TEX. BUS. ORGS. CODE §§ 1.002(36), 3.005, 3.101, 22.102. If First Presbyterian wanted limits on its corporate ownership rights, these foundational documents would be the place to include a universal denominational trust in favor of PCUSA. *See Peters Creek United Presbyterian Church v. Washington Presbytery of Penn.*, 90 A.3d 95, 110 (Pa. Commw. Ct. 2014) (incorporation of PCUSA constitution and trust clause into bylaws established trust); *Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)*, 291 P.3d 711, 714, 724-25 (Or. 2012) (addition of trust clause to articles of incorporation created trust). The PNC is aware of this requirement. CR 2955.

The evidence establishes that First Presbyterian's charter and bylaws have never created, recognized, or referenced a trust. CR 2743-58. Rather, First Presbyterian has a history of firmly—perhaps even adamantly—rejecting any trust arrangement.

First Presbyterian's first corporate charter is dated January 4, 1887. CR 2464, 2743-48. It contains no trust language. CR 2743-48. Instead it states that "all of the property, right and estate of this Church, as now vested in this Congregation, shall pass to and vest in said Corporation." CR 2747. By vesting First Presbyterian with "all" the property rights held by the congregation, the corporate charter negates any inference that First Presbyterian holds a trust interest for any third party. The 1886 congregational resolution approving the charter emphasized this conclusion by explaining that the congregation decided to "pursue this course to protect the interests of the Congregation." CR 2748.

First Presbyterian's assertions of property ownership continued. It amended its corporate charter in December 1887 to its current form to add one provision to support its right of ownership:

> The purposes for which said Corporation is formed is the support of the public worship of God according to the form of Government of "The Presbyterian Church in the United States,"[4] and as incidental thereto, **shall have power to purchase and own and enjoy in any way it may seem fit, an estate in fee, or any less estate or interest in lands or real estate in the said City of Houston, and to sell mortgage or convey the same or any estate or interest therein**, … and to give as security for the payment of said borrowed money a deed of trust or mortgage on the property both real and personal, of said Corporation now owned or held by it, or that may be hereafter acquired by it.

CR 2750-51 (emphasis added); *see* CR 2753-56.

---

[4] This is the only mention of a denomination anywhere in the charter. The PCUS constitution in 1887 contained no property provisions anywhere, much less a trust clause. *See* CR 4037.

First Presbyterian's corporate charter and bylaws do not support any claim that it holds property in trust for PCUSA. Such an assertion is incompatible with the express assertions in the charter that First Presbyterian owns its property outright and has the power and authority to determine how any property is held.

Far from limiting its ownership rights, First Presbyterian's charter and bylaws reflect an intent to incorporate as an autonomous Texas corporation, complete with all the powers bestowed by Texas law, including the explicit right to take and hold property in full ownership.[5] *See* CR 2743-58.

> ### c. No provision in the governing documents of PCUS or PCUSA creates a trust in PCUSA.

A proper application of neutral principles of law may include examining the pertinent denominational constitution. But if the constitution is used to establish an enforceable trust, it has to comply with Texas law. The document should be viewed through a secular lens and without reliance on religious precepts. *Jones*, 443 U.S. at 601-04. The current PCUSA constitution and the past constitutions of its predecessor, PCUS, do not establish that First Presbyterian holds any property in trust for PCUSA.

---

[5] FPC's corporate charter contrasts starkly with the language found in the "model" Articles of Incorporation advocated by PCUSA. CR 2954-60. Acknowledging the well-settled autonomy of the corporate form and the importance of securing a church's consent to create a trust, PCUSA encourages local churches to include a provision in their charters that states: "All property, both real and personal, held by or for the particular church, whether title is lodged in the Corporation, the board of trustees or a trustee, or an unincorporated association, and whether the property is used in programs of the particular church or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." CR 2955. FPC has never amended its charter to conform to the PCUSA "model."

***Current constitution.*** The current PCUSA Book of Order purports to contain an express trust clause. CR 3774 (G-4.0203). The clause is entitled: "Church Property Held in Trust," and provides:

> All property held by or for a congregation, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a congregation or of a higher council or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

*Id*. This clause was first added to the PCUS Book of Church Order in 1982/83 as section 6-3 and was included in the 1983/84 edition of the PCUSA Book of Order and subsequent editions. CR 2697 (§ 6-3); CR 2716-17 (G-8.0201). But in its appellate brief, the PNC does not rely on this clause because this clause does not suffice under Texas law. *See* CR 3013 (PNC's corporate representative, Reverend Cole, admitted that *Masterson* precludes reliance on the express trust clause).

First, this clause constitutes a unilateral statement by PCUSA, the purported beneficiary. The beneficiary's unilateral statement cannot create a trust. *Wise*, 103 S.W.2d at 483. Instead, a trust depends on the intent of the settlor. But First Presbyterian did not manifest any intent to create a trust. Instead, it voiced its disagreement to the trust clauses immediately and over the last thirty years whenever this issue arose. CR 2702-34, 2963-77, 3039-46.

Further, any trust created during the 1980s is presumed to be revocable. *See* TEX. PROP. CODE § 112.051(a) ("A settlor may revoke the trust unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it."). As *Masterson* recognized, "[t]he Texas statute requires *express* terms in making it irrevocable." 422 S.W.3d at 613 (emphasis orig.). The trust clauses in the PCUS and PCUSA constitutions in no way purport to be irrevocable.

If First Presbyterian were somehow considered to have intended a trust, it has revoked any such intent in two ways: (1) the congregational resolution passed on March 11, 1984, rejecting all new PCUSA or PCUS property provisions; and (2) the FPC Session's formal revocation of any trust on August 19, 2014, after the *Masterson* opinion was issued. CR 2702-12, 2713-15, 3070-73.

In addition, First Presbyterian timely invoked the PCUSA constitution's exception to the trust clause (G-4.0208 (formerly G-8.0701)). CR 2701, 2702-28, 3775. This exception allowed former PCUS churches to be excused from PCUSA's new property provisions and to be governed by PCUS's property provisions in the pre-reunification constitution. CR 3775. Specifically, this meant that First Presbyterian could rely on former section 6-2, which gives a local church control in "buying, selling, and mortgaging of the property for the church" without having to seek approval. CR 3011, 4174-75.

29

***Past constitutions.*** Just as the current constitution fails to establish a trust for PCUS/PCUSA, so do past constitutions and governing documents. From First Presbyterian's founding in 1839 to 1982, no trust clause of any kind appeared in the any of the constitutions of the Presbyterian denominations with which the church has been affiliated. Rather, beneficial ownership remained with individual congregations, as the summary judgment evidence establishes.

For instance, PCUS formed a committee in 1950 to study church property ownership, and the 1952 report stated: "The legal title to property of a particular church is in its trustees on behalf of that congregation. Therefore, the property is actually controlled by that congregation. This is recognized by both Civil and Ecclesiastical courts. The right to hold and dispose of property is granted by the State." CR 2686, 4039. This does not evidence a trust.

A second committee studied this question, and its 1953 report became the General Assembly's "declaratory statement" on the property issue:

> The beneficial ownership of the property of a particular church of the [PCUS] is in the congregation of such church and title may properly be held in any form, corporate or otherwise, consistent with the provisions of civil law in the jurisdiction in which such property is situated. The congregation, with respect to such property may properly exercise any privilege of ownership possessed by property owners in such jurisdiction.

*Id*. The General Assembly reaffirmed the declaratory statement in 1967 and 1971. CR 2686-87, 4039-40; *see* CR 2981 ("In the years leading up to reunion in 1983,

the PCUS General Assembly repeatedly reaffirmed a statement adopted in 1953 which said that title to church property could be held in any legal form, the congregation was the beneficial owner with all the rights of a property owner."). These statements are not indicative of a trust, either.

Furthermore, when PCUS proposed to amend its Book of Church Order to add the trust clause for its own benefit, the denomination's chief officer and top elected official (the Stated Clerk) assured that adoption of the trust clause would not change the 1953 declaratory statement. CR 2760 ("These amendments do not give Presbytery, Synod, or General Assembly any jurisdiction over property."). Likewise, he also informed the General Assembly that "[t]he language dealing with trust does not in any way establish any kind of an encumbrance on church property as that term is understood in connection with real estate." CR 3000.

In sum, an express trust clause was inserted in the early 1980s in both the PCUSA and PCUS constitutions, and nothing about trusts was included in the prior constitutions. But PNC has searched past and current constitutions of the PCUS/PCUSA for another clause to call a trust clause. PNC now bases its argument on a peculiar clause about church dissolution that first appeared in the 1925 PCUS Book of Church Order and was carried forward in later versions of the PCUSA Book of Order. For the reasons explained below, all of PNC's arguments fail.

**C. PNC's arguments regarding paragraph 158 of the PCUS Book of Church Order and its successors fail.**

Because the express trust clause in the Book of Order will not suffice to create a trust, PNC now argues that (1) a clause dealing with church dissolution in the 1925 PCUS Book of Church Order is a trust clause, and (2) when FPC renewed its corporate charter in 1938, it consented to that clause and thereby created an irrevocable trust for all time. Br. at 17-34. Those arguments have no merit. The dissolution clause is not a trust clause; First Presbyterian has not consented to it; and, in any event, First Presbyterian has not been dissolved.

**1. Paragraph 158 and its successors are dissolution clauses, not trust clauses.**

Paragraph 158 is a dissolution clause, not a trust clause. Its plain language makes its purpose obvious:

> If a church shall be dissolved by the Presbytery, or otherwise cease to exist, and no disposition has been made of its property, those who hold the title to the property shall deliver, convey, and transfer to the Presbytery of which the church was a member, or to the authorized agents of the Presbytery, all property of the church; and the receipt and acquittance of the Presbytery, or its proper representatives, shall be a full and complete discharge of all liabilities of such persons holding the property of the church. The Presbytery receiving such property shall apply the same or the proceeds thereof at its discretion.

CR 4279.

The later PCUS and PCUSA constitutions contain a similar clause. CR 4175 (§ 6-3); CR 2697 (§ 6-4); CR 2700, 3774 (G-4.0205). This clause applies only in two instances: (1) if the presbytery acts to "dissolve" a local congregation, and (2) if the congregation "cease[s] to exist." The clause does not create a trust.

First, a trust is a fiduciary relationship in which one person, a trustee, holds a property interest for the benefit of another. *Meyers*, 6 S.W.2d at 394-95; *see* TEX. PROP. CODE § 111.004(4). However, paragraph 158 says nothing about First Presbyterian or anyone else acting as a trustee over any of First Presbyterian's property for the benefit of PCUS/PCUSA.

Second, a trust is created only if the settlor properly manifests an intention to create a trust. *Cahill*, 88 S.W. at 548. There is nothing in paragraph 158 whereby First Presbyterian manifested an intent to create a trust over all its present and future property. Just like the unenforceable express trust clauses inserted into the PCUS and PCUSA constitutions in the early 1980s, paragraph 158 and its successors are merely unilateral statements by the beneficiary, which are insufficient to create a trust. *See Wise*, 103 S.W.2d at 483.

Third, the PNC and PCUS/PCUSA have never treated Paragraph 158 and its successors as trust clauses. Rather, the past governing documents show that they never claimed a beneficial interest in a congregation's property based on these sections when church property issues arose. *See supra* at 30-31.

Chief Justice Radack alluded to this in *Windwood Presbyterian Church, Inc. v. Presbyterian Church (U.S.A.)*, 438 S.W.3d 597 (Tex. App.—Houston [1st Dist.] 2014, no pet.). There, she recounted the history of the PCUS. *Id*. at 599. After that historical examination, her court indicated that no trust clause existed before the early 1980s. *Id*. ("The PCUS did not have any trust provisions in its constitution at the time of Windwood's incorporation [in 1971].").

Finally, the PNC stretches Professor Johanson's statements regarding the dissolution clause. Br. at 24-26, 33. Johanson opined only that the dissolution clause would apply if the trial court determined that there was no trust and then FPC was dissolved thereafter. CR 4378-79. But he did not opine that PCUSA would be entitled to the property. Instead, Johanson stated without exception that there was "zero evidence" of any trust at any time: "First Presbyterian Church of Houston holds all of its property as full exclusive owner, without any trust of any kind in favor of the presbytery or the national church." CR 3023-24; *see also id*. at 3018 ("no express trust, implied trust, constructive trust, resulting trust, or any other form of trust in favor of the PCUSA or the Presbytery arose…by reason of any facts, circumstances, documents or events arising or occurring from 1839 until the present time.").

Moreover, Johanson stated in his affidavit that the dissolution clause did not give PNC any enforceable right over FPC's property. CR 3018-19 ("§ 6-3 of the 1981/82 PCUS Book of Church Order cannot by its own force **ever** impose any civilly enforceable right by the Presbytery to determine the disposition of FPC property" (emphasis added)).

### 2. First Presbyterian's renewal of its charter in 1938 is not evidence of intent to create a trust.

The PNC contends that when First Presbyterian renewed its charter in 1938, it created a trust by the act of consenting to the 1925 PCUS constitution with the dissolution clause. Br. at 26-27. This argument fails.

As noted earlier, the dissolution clause does not create any sort of trust at all, so there was no trust arrangement to which First Presbyterian could consent. A trust is created only if the settlor has "clearly manifested" an intention to create a trust. *Dulin*, 70 S.W. at 743. The renewal of a corporate charter is not a clear manifestation of an intent by First Presbyterian to create a trust over all of its present and future property for the benefit of PCUS/PCUSA.

Furthermore, nothing in the charter renewal mentions creating a trust in property for the benefit of PCUS. Instead, First Presbyterian reiterated its ownership of its property when it extended its corporate existence by affirming "all the privileges, powers, immunities, right of succession by its corporate name, and

**rights of property, real and personal, exercised and held by the corporation** at the expiration of the period of existence specified in its said original charter." CR 2754 (emphasis added). The events of 1938 did not create a trust.

### 3. The "dissolution clause" is in any event inapplicable to a thriving local church such as First Presbyterian.

Last, the notion of First Presbyterian being "dissolved" rests on a myth. First Presbyterian has not been "dissolved" or anything approaching dissolution in the ordinary sense of the word. The PNC wants to give the word "dissolved" a strange and idiosyncratic meaning, but that effort is unpersuasive.

#### a. The ordinary meaning of the language applies.

Paragraph 158 speaks of a church that is "dissolved" or "cease[s] to exist." CR 4279. Those terms are easily understood. When given their ordinary meaning, those terms do not remotely apply. First Presbyterian is alive and well. It runs vibrant and ongoing service programs for the benefit of the local community, as the stipulations demonstrate. It has not been dissolved or ceased to exist in any accepted sense of those terms.[6]

---

[6] First Presbyterian is a Texas corporation, governed by the statutory provisions that apply to corporations, including those that involve dissolution and winding up. *See* TEX. BUS. ORGS. CODE §§ 22.164, 22.301, 22.302, 22.305; *see also Sherman Gin Co. v. Planters Gin Co., Inc. of Indianola*, 599 S.W.2d 348, 350 (Tex. Civ. App.—Texarkana 1980, writ ref'd n.r.e.) ("Dissolution is a function of the state which created the corporation, therefore, it is a proceeding unique and exclusive to the forum state.").

But the PNC wants to give this language a special meaning, and for support it points to the testimony of one of its witnesses (Rev. Dr. Hooker). *See* PNC Br. at 20-21. The PNC says that a church is "dissolved" or non-existent when it becomes disaffiliated with the denomination. *Id.* Nonsense.

Courts give words their ordinary meaning unless a specialized meaning is clear from the instrument itself. *See Texas West Oil & Gas Corp. v. El Paso Gas Transp. Co.*, 631 S.W.2d 521, 523 (Tex. App.—El Paso 1982, writ ref'd n.r.e.) ("The terms the parties used are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows the terms are used in a different sense."); *Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152, 154 (Tex. Civ. App.—Amarillo 1980, writ ref'd n.r.e.) (same).

The PNC cannot end-run neutral principles by simply declaring that words mean what it wants them to mean. Learned Hand's example of the twenty bishops rule comes to mind. *See Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) ("If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.") (quoted with approval in *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)). The trial court was not compelled to let the PNC dictate the meaning of words.

997.115/567149      37

### b. *A local church is not dissolved and does not cease to exist merely because of strained or severed relations with a denomination.*

Courts have faced this language before. In *Christensen v. Roumfort*, 20 Ohio App. 3d 107 (1984), the Presbytery relied on the Book of Order and argued that a church was dissolved by merely severing ties with the denomination. The court had none of it. The local church "still maintains a place of worship and its members are clearly not dispersed." *Id.* at 110.

The court's reasoning could have been chosen for our case: "Tabernacle held title to the property free of any competing interests. The deeds all named Tabernacle as the grantee and contained no forfeiture or reversionary clause in favor of appellants nor does the record indicate that the property was acquired by any kind of restrictive gift. The language of the deed contains no restrictions. The Book of Order relied upon by the appellants does not apply in this instant case." *Id.*

To like effect is *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States*, 476 N.Y.S.2d 86, *cert. denied*, 469 U.S. 1037 (1984). There, the local congregation withdrew from the denomination. The Presbytery pointed to a dissolution clause in the denomination's Book of Order, but the court was unpersuaded: "That provision is inapplicable because plaintiff church is not undergoing a dissolution or extinction." *Id.* at 93.

Nor has First Presbyterian ceased to exist. *See* BLACK'S LAW DICTIONARY (7th ed.) ("cease" means to "stop, forfeit, suspend, or bring to an end" or to "become extinct; to pass way"); MERRIAM-WEBSTER DICTIONARY ("exist" means "to have being" or "to continue to be").

This issue arose in *General Convention of the New Jerusalem in the United States of America, Inc. v. MacKenzie*, 449 Mass. 832 (2007). There, a bylaw entitled "Dissolution" referred to the case of a church ceasing to exist. When the church cut ties with the denomination, did it cease to exist? No. "We do not locate an ambiguity in the language of the dissolution bylaw, and hold that it is triggered only upon dissolution, and not by disaffiliation." *Id.* at 836. "More importantly, it is undisputed that the church continues to exist, and that it engages in religious and charitable activities, much as it had done before disaffiliation." *Id.* "Turning to the plain text of the bylaw, it is entitled 'Dissolution,' and disaffiliation is mentioned nowhere in the text." *Id.* at 836-37. "To read disaffiliation into this text is to strain the plain words more than contract law permits." *Id.* at 837.

By its own terms, the dissolution clause is not triggered if a church is dismissed to another denomination. Dissolution and dismissal to another congregation are not synonymous. The PNC agrees that the two words are not the same. CR 4389-97. So even if First Presbyterian were dismissed to another denomination on some future date, that would not mean that it is dissolved.

In addition, paragraph 158 places a congregation's property with the PCUSA only if "no disposition has been made of its property." CR 4279. Here, FPC has made a disposition of that property. In accordance with Texas law and its corporate charter, FPC amended its bylaws at a Session meeting called on November 18, 2014, to provide for the disposition of all corporate assets in the event of a dissolution of the corporation. CR 3074-75. The PNC's argument that the phrase means a "possibility" that a presbytery and local church "might" agree on a property disposition is contrary to the plain meaning of the phrase and has no support. *See* Br. at 22-23.

The PNC argues impliedly that FPC could not take this action without its consent. *See id.* But that is not true. FPC could take this action without PCUSA's consent because FPC voted in 1984 to be exempt from the PCUSA constitution's new property clauses. CR 2713, 3775. By doing so, FPC elected to be governed by section 6-2 of the 1981/82 PCUS constitution, under which there is no question that FPC had control over "buying, selling, and mortgaging of the property for the church" without having to seek approval. CR 3011, 4174-75.

*To sum up*: Texas law has always required a clear expression of intent by the settlor to create a trust. No such clear expression has ever come from First Presbyterian. The trial court ruled correctly in holding that no trust exists on First Presbyterian's property.

## II. THE PROPERTY ISSUE IS JUSTICIABLE.

Issue 2 presents the question of whether the courts may hear this case. The answer is Yes. The trial court correctly held that it could resolve the property issue without crossing the constitutional boundary line between church and state.

### A. The general rule allows courts to resolve property cases by applying neutral principles.

After *Masterson*, all agree that courts have the power to apply ordinary, neutral legal rules in church property cases. This general power allows courts to construe contracts, deeds, articles of incorporation, and other legal instruments. *See Jones*, 443 U.S. at 602 ("There can be little doubt about the general authority of civil courts to resolve this question."); *Lacy*, 132 S.W.3d at 123 ("Courts do have jurisdiction to review matters involving civil, contract, or property rights even though they stem from a church controversy." (quotation omitted)).

In fact, the state "has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones*, 443 U.S. at 602 (citing *Presbyterian Church in United States v. Hull Memorial Presbyterian Church*, 393 U.S. 440, 445 (1969)); *see Masterson*, 422 S.W.3d at 606 ("Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists.").

## B. The general rule has an exception.

This general rule nevertheless has an exception: it is conceivable that a deed or other legal document could incorporate religious concepts so heavily as to make the case unfit for judicial decision. The court noted this possibility in *Masterson*: "We recognize that differences between ecclesiastical and non-ecclesiastical issues will not always be distinct, and that many disputes of the type before us will require courts to analyze church documents and organizational structures to some degree. Further, deferring to decisions of ecclesiastical bodies in matters reserved to them by the First Amendment may, in some instances, effectively determine the property rights in question." *Masterson*, 422 S.W.3d at 606.

The phrase "effectively determine" comes up a second time later in the *Masterson* opinion, where the court discusses the possibility of overlap between religious matters and property rights:

> So what happens to the relationship between a local congregation that is part of a hierarchical religious organization and the higher organization when members of the local congregation vote to disassociate is an ecclesiastical matter over which civil courts generally do not have jurisdiction. *Milivojevich*, 426 U.S. at 713-14, 96 S.Ct. 2372. But what happens to the property is not, unless the congregation's affairs have been ordered so that ecclesiastical decisions ***effectively determine*** the property issue.

*Masterson*, 422 S.W.3d at 607 (emphasis added).

How often does this exception exist? Not very. The denomination tried to invoke the exception in *Masterson*, with no success: "But although we agree with

the court of appeals as to these conclusions [about certain ecclesiastical issues], we disagree with its determination that the question of who owns the property is inextricably linked to or determined by them." *Id.* at 608.

## C. The narrow exception to neutral principles—for cases where *"ecclesiastical decisions effectively determine"* property rights—is inapplicable.

The PNC seeks to fit within the loophole recognized in *Masterson*. According to the PNC, this is one of those rare instances where the property issue depends on a religious issue. *See* PNC Br. at 34 ("This case is not the typical church property dispute case over which courts generally have jurisdiction").

To support this contention, the PNC points to the GRD process. *See* PNC Br. at 34-40; CR 1422-34. The premise of its argument is that the GRD process covers more than just the relationship between a congregation and the denomination. Roughly speaking, the PNC casts the GRD process as a broad form of universal alternative dispute resolution, like arbitration.

### 1. The GRD process does not cover property disputes.

But that premise is invalid. Nobody signed an arbitration clause. Nothing in the GRD process trumps the normal role of the courts in deciding property cases. The GRD process does not adjudicate or resolve disputes about property rights. Rather, it addresses only the issue of denominational affiliation, *i.e.*, whether a local congregation should stay or go.

The PNC, however, portrays the GRD process as one that covers all disputes. Thus, the PNC says that the two sides "agreed to have their disputes resolved through an ecclesiastical process called the Gracious Reconciliation and Dismissal ('GRD') Procedure." PNC Br. at 35. The PNC says that the parties will resolve "their disputes" through a collaborative exercise in "discerning God's will." *Id*.

But the documents at issue do not reach nearly that far. They do not bind the parties categorically to resolve **all** "their disputes" through the GRD. Nor do they make the outcome of every dispute depend on "discerning God's will." A fuller quotation from the Covenant Agreement reveals that the only purpose of seeking God's will is to determine the relationship between the local church and the denomination:

| PNC Brief at 35 | Covenant Agreement text (CR 1466) |
|---|---|
| The Covenant Agreement calls upon the participants to abide by the procedure "as a way of discerning God's will." App. L; CR 1466, 4080. | … therefore, the General Council of the Presbytery of New Covenant and the congregation of the First Presbyterian Church of Houston, Texas, covenant to follow the Gracious Reconciliation and Dismissal Procedure and abide by its terms as a way of discerning God's will *for the relationship between the congregation and the Presbytery of New Covenant*. |

Our case does not ask the courts to determine the relationship between the PNC and the congregation. That issue has nothing to do with this property case.

The two documents that bear on this issue are the one-page document entitled "Covenant Agreement" and the longer document that recites the GRD procedure. In the covenant agreement, the two sides stated in writing that they "covenant to follow the Gracious Reconciliation and Dismissal Procedure and abide by its terms as a way of discerning God's will for the relationship between the congregation and the Presbytery of New Covenant." CR 1466.

The GRD papers, in turn, are all about the relationship between the congregation and the PNC. CR 1422-30. The GRD process deals with a relationship, not with property rights. It does this on page after page.

On page 1, the GRD document refers to events that have "caused some congregations to reconsider their connection" with the denomination. CR 1422. On page 3, its first sentence speaks of congregations that "are considering dismissal from the denomination." CR 1424. It addresses the prospect of a congregation choosing to "affiliate with another Reformed denomination." *Id.* It lists three paramount questions, each of which uses the words "congregation" and "Presbyterian Church (U.S.A.)," with none of those three questions referring to property. *Id.*

Page 4 begins with a reference to a local "session seeking or considering dismissal from the denomination." CR 1425. But page 4 says nothing about property or associated disputes. Likewise, page 5 speaks of seeking common

ground "between the congregation and the denomination." CR 1426. It ends by referring to the congregation either staying in a "relationship with the Presbyterian Church (U.S.A.)" or calling a meeting "to recommend dismissal to another Reformed body." *Id.* Once again, property never comes up.

Page 6 of the GRD procedure is more of the same. CR 1427. Its caption uses bold print and all capitals in referring to the "PRESBYTERY-CONGREGATIONAL RELATIONSHIP." *Id.* It never mentions property disputes. And it would not be applicable here because the vote for First Presbyterian to be dismissed from the PCUSA did not pass. CR 1526, 2466.

The only references to property appear on pages 7-8, in a section entitled, PROCEDURE FOR SEEKING DISMISSAL. CR 1428-29. Clauses 4 and 6 refer to property. Clause 4 says that if two-thirds of the congregation vote for dismissal, the PNC will agree to it and let the congregation "depart with all of its property intact." CR 1428. Clause 6 addresses the situation in which a congregation leaves, but a minority stays and starts a new church, using funds made available "before dismissal of the majority with property." CR 1428-29. (Clause 6 adds that "'the church' in a particular area is not its building or financial assets, but the people of the congregation.")

Neither of these references to property indicates any intention to use the GRD process as the exclusive and general method for resolving disputes about

who owns what. Clauses 4 and 6 do not even come into play unless a congregation has decided to leave the denomination by a two-thirds vote. But no such two-thirds vote has occurred. To the contrary, the congregation voted and remains right where it has been for many, many years.

## 2. Even if applicable, the GRD process was not abandoned.

Based on its flawed premise that the GRD process applies in the first place, the PNC next contends that the congregation abandoned the GRD process and therefore surrendered to the "Alternative Process." PNC Br. at 35-36. But the record shows no abandonment.

The PNC floats this contention in two places. First, in its factual narrative, it says that the discernment team was supposed to create and conduct a process for reaffirmation to the Presbytery-congregational relationship, but that this allegedly "never happened." PNC Br. at 11. The brief cites nothing to support its claim that this "never happened." It then goes on to point to the filing of the declaratory judgment action, with no further citation to the claim about the actions of the discernment team.

Second, the PNC brief devotes a paragraph to the assertion that First Presbyterian "did not complete the GRD Procedure and instead abandoned that procedure." Br. at 36. The brief cites to testimony from a PNC witness who took the stand in the temporary injunction hearing. *Id.* (citing 3 RR 270-75).

The witness, Rev. Mike Cole, referred to a draft document that was sent to the PNC by a representative of First Presbyterian. The document deals with reaffirmation of the relationship between the congregation and the presbytery, pursuant to page 6 of the GRD procedure. Reverend Cole described the document as perhaps "a very first initial baby step" in reconciling the two sides, but not enough to satisfy his standards. 3 RR 272.

Reverend Cole went on to indicate that since the litigation began, he and the PNC had avoided contact with the First Presbyterian's leadership: "Since the TRO was put in place, I've had virtually no contacts with any of the leadership." 3 RR 284. "I – so, perhaps I've erred on the – on the side of caution." 3 RR 285. "I just wanted to – to be – make sure that we were not doing anything that the Court would construe as in violation of the TRO." *Id.*

As the Court can see, this evidence does not show abandonment by First Presbyterian. If anything it shows that ***the PNC*** stopped participating during the life of the TRO, which expired long ago. But nothing shows that ***First Presbyterian*** abandoned the process or, again, that the "process" had anything whatsoever to do with deciding whether First Presbyterian owns its property in trust for the PCUSA.

The GRD process says on page 6 that "the Discernment Team will create and conduct a process" for reaffirming the Presbytery-congregational relationship. CR 1427. If the Discernment Team needs to do something further to improve relations between the PNC and the congregation, that is all well and good, but that does not even approach showing abandonment by First Presbyterian. In fact, when asked directly whether First Presbyterian abandoned the GRD process, Reverend Cole expressed uncertainty: "That's still a question in my mind." 3 RR 118. That agnostic answer is no evidence of abandonment.

Nor did the trial court make any factual finding of abandonment after taking evidence on the PNC's challenge to the court's subject-matter jurisdiction. The court received evidence—in the form of both exhibits and testimony from the witness stand—and was entitled to sit as fact-finder regarding the issue of abandonment. The evidence just mentioned shows that First Presbyterian did not abandon the GRD process.

In sum, the property rights issue in this case falls within the competence of the courts to adjudicate. Just as in *Masterson*, the property decision depends on neutral principles of law, not on ecclesiastical determinations. Issue 2 should be overruled.

## III. THE ANCILLARY INJUNCTION IS VALID.

Issue 3 presents the question whether the injunctive component of the judgment constitutes error. CR 4454-56. The answer is No. The trial court did what prior courts have done.[7] Its decree tracks the language from *Carrollton Presbyterian Church v. Presbytery of South Louisiana of Presbyterian Church (USA)*, 77 So. 3d 975 (La. App. 2011). Nothing requires a contrary result here.

### A. The trial court permissibly supported its declaratory judgment with ancillary injunctive relief, as authorized by statute.

In the final section of the statute, the Declaratory Judgments Act empowers a court to supplement a declaration with "[f]urther relief" whenever doing so is "necessary or proper." TEX. CIV. PRAC. & REM. CODE § 37.011. Further relief normally takes the form of an injunction. *State v. Anderson Courier Serv.*, 222 S.W.3d 62, 66 (Tex. App.—Austin 2005, pet. denied); *see Tara Partners, Ltd. v. City of S. Houston*, 282 S.W.3d 564, 578 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) ("'further relief' under section 37.011 is typically injunctive relief").

---

[7] *See, e.g.*, *New Covenant Presbyterian Church, Inc. v. The Presbytery of S. La. of the Presbyterian Church (USA)*, Suit No.: 602832, § 27, 19th Jud. Dist. Ct., E. Baton Rouge Parish, La.; *First Presbyterian Church PCUSA of Starkville, Miss. v. Presbytery of St. Andrew, Presbyterian Church U.S.A., Inc.*, Cause No. 2015-0151-D, Chancery Ct. Oktibbeha Cty., Miss.; *First Presbyterian Church of Greenwood, Inc. v. Presbytery of St. Andrew, Presbyterian Church U.S.A., Inc.*, Cause No. G15-0064, Chancery Ct. Leflore Cty., Miss.; *First & Calvary Presbyterian Church v. John Calvin Presbytery*, Case No. 1531-CC00924, Circuit Ct. Greene Cty., Mo.; *First Presbyterian Church of Wichita Falls v. Palo Duro Presbytery*, Cause No. 182,783-B, 788th Jud. Dist. Ct., Wichita Cty., Tex.; *see Highland Park Presbyterian Church Inc. v. Grace Presbytery, Inc.*, 2013 WL 5538716 (N.D. Tex. Oct. 7, 2013).

50

Rulings under § 37.011 are reviewed for abuse of discretion. *Lakeside Realty, Inc. v. Life Scape Homeowners Ass'n*, 202 S.W.3d 186, 190 (Tex. App.— Tyler 2005, no pet.); *see Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("The granting or denial of a request for a permanent injunction is within the trial court's sound discretion").

The trial court acted permissibly in exercising its discretion the way it did. Courts routinely issue ancillary injunctions to supplement and enforce their declarations. Sometimes the need for an injunction might be unclear, because it may be debatable whether there is a real risk of noncompliance with the court's judgment. But not here. The PNC now claims to feel bound to act on its views about property ownership:

- "The Presbytery believes that '[i]n the final analysis, the right in and to all property within its ecclesiastical jurisdiction belongs to the Church as a whole – the entire denomination.'" Br. at 41.

- "The basis for this belief is theological." *Id.*

- "how can the Presbytery allow a local church to reject the denomination's Constitution when other Presbyterian churches are faithfully adhering to the Presbyterian principle that the denomination as a whole has a beneficial interest in church property?" *Id.* at 42.

The PNC does not fault the trial court for misreading its intentions. Instead, the PNC apparently claims a First Amendment right to subject First Presbyterian to what would be a hostile takeover.

The trial court acted sensibly in granting the supplemental relief. The language of the injunctive decree essentially tracks the language of similar decrees in earlier cases. The most notable is the *Carrollton* case from 2011, which upheld the injunction: "The injunctive relief is narrowly focused and restricted to actions affecting the property that is the subject matter of this litigation." *Carrollton*, 77 So. 3d at 984. "The prohibited actions enumerated in the injunction are specifically limited to instances affecting the instant church property dispute." *Id.*

The same form of injunctive relief was granted in 2013 in a Dallas case called *Highland Park Presbyterian Church Inc. v. Grace Presbytery, Inc.*, No. 13-10605, in the 298th Judicial District Court of Dallas County.

To ensure that the decree does not intrude on the PNC's rights, the trial court included a savings clause: "Nothing in this Permanent Injunction shall preclude the Presbytery of New Covenant, Inc. from taking ecclesiastical action for non-pretextual ecclesiastical cause that is unrelated to this litigation or any property issue raised in, prompted by, related to, or affecting the ownership, control, use, or disposition of the Personal or Real Property held by, for or in the name of First Presbyterian Church of Houston." CR 4456.

This savings clause mirrors the one in *Carrollton*. It should be upheld for the reasons given by that court. If courts are to have the authority to resolve property issues by rendering a judgment, they need the concomitant authority to

see that their judgments mean something. There is no point in letting trial courts issue decisions that the loser can promptly disregard and take steps to undermine. Given the savings clause and given the decision in *Carrollton*, the Court should overrule Issue 3.

Nevertheless, in the event that the Court finds the injunction to go further than it should, the Court should construe it in a way that upholds its basic intent as much as possible. The Supreme Court did this in *North East Texas Motor Lines, Inc. v. Dickson*, 148 Tex. 35, 219 S.W.2d 795 (1949), which involved an injunction against picketing. The court chose to construe the injunction so as to be constitutionally valid: "it is in fact to be construed only as an injunction against picketing unless and until some ground arises therefor." *Id.* at 798.

No one wishes to interfere with anybody's free exercise of religion. The trial court simply acted to prevent the PNC from undercutting the judicial resolution of this property rights dispute. If it is necessary to read the injunction in a particular way in order to comply with constitutional requirements, the Court should follow *North East Texas Motor Lines* and do so here.

**B.      The PNC's objections to the injunctive relief are unpersuasive.**

The PNC appears to claim a constitutional right to retaliate and change the locks. *See* Br. at 43. It phrases this in terms of the right to impose church discipline however it wishes, including by dissolving a church.

No one quarrels with the right of any church to impose discipline in keeping with the tenets of the church's faith. But in the trial court, the PNC disclaimed holding any belief that its faith required it to take the steps that the injunction inhibits:

Q      Does Presbytery have any intent to seek an administrative commission with respect to First Presbyterian Church?

A      No.

       ***

A      ... We've had a good longstanding relationship with First Presbyterian Church. Have never, neither I nor our leadership have ever felt any particular need to resort to an administrative commission or any kind of, what some would term hardball tactics, in dealing with folks that we count as friends.

Q      If the – if there were no injunction in this case, would – would Presbytery change the locks on the property at First Presbyterian Church?

A      No.

Q      Would it [seiz]e the property at First Presbyterian Church?

A      No.

Q      Would it fire the ministers?

A      No.

Q      Would it replace the Session?

A      No.

Q      Would it seek to dissolve First Presbyterian Church?

A      No.

3 RR 282-84.

This testimony came from Reverend Mike Cole, the PNC's General Presbyter. He is the PNC's top official (3 RR 92), so he should surely know what constitutes a fundamental tenet of the church's faith. His sworn testimony is hard to square, however, with PNC's appellate spin. The appellate brief hints at a desire on the PNC's part for "taking ecclesiastical actions that it may conclude are necessary as a consequence of the First Presbyterian's actions with respect to church property." Br. at 42; *see id.* at 45 ("might be compelled").

Be that as it may, nothing in the injunction prohibits the PNC from going about its ordinary business. *See* CR 4452-56. All the injunction does is to enforce the property-rights declaration. As it states in the savings clause, nothing in the injunction keeps the PNC from taking any ecclesiastical action that is "unrelated to this litigation." CR 4456.

The courts cannot and should not tell the PNC what to believe, but the trial court had every right to take the PNC's top official at his word when he demonstrated that the PNC does not in fact believe that it is compelled to take the kinds of actions that it now openly discusses. A court may inquire into "whether the ascribed religious-based reason was in fact the reason" for challenged action by a religious organization. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 628 (1986); *see Gillette v. United States*, 401 U.S. 437, 457 (1971) ("'[T]he "truth" of a belief is not open to question'; rather, the question is

whether the objector's beliefs are 'truly held.'" (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965))).

Despite earlier having disclaimed its interest in taking adverse actions against First Presbyterian and its personnel, the PNC now says that it may have to take such actions anyway. The PNC asserts a constitutional right to do this under *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S.Ct. 694 (2012), on the theory that church discipline is categorically off-limits to the courts. *See* PNC Br. at 44-45. But that reading of *Hosanna-Tabor* goes further than the Supreme Court went.

*Hosanna-Tabor* holds that employment-discrimination laws are subject to a "ministerial exception" to judicial involvement. 132 S.Ct. at 706. But it did not extend the ministerial exception to cases outside the employment-discrimination setting: "The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise." *Id*. at 710.

Outside the employment-discrimination setting, the practice continues to be that courts may determine whether challenged actions are pretextual. That is the holding of *Dayton Christian Schools*, *Gillette*, *Seeger*, and a line of similar cases. *See, e.g.*, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 693 (1989) ("under the First Amendment, the IRS can reject otherwise valid claims of religious benefit only on the ground that a taxpayers' alleged beliefs are not sincerely held, but not on the ground that such beliefs are inherently irreligious."). The trial court's injunction did nothing more than follow this established legal principle.

The PNC appears to want the power to end-run a loss at the courthouse by not just changing the locks. Rather, it now claims a right to destroy its opponent through a hostile takeover. More particularly, the PNC claims that, but for the permanent injunction now in place, it would be entitled to demand that First Presbyterian reverse the actions that it has taken to protect its property and, if First Presbyterian declined, to act as its sister presbytery in this synod has done (*i.e.*, *Carrollton*, 77 So. 3d at 984), and presumably form an Administrative Commission to take over First Presbyterian, fire the pastors and the governing session, appoint a new session and then file a brief in this Court that it agrees with Appellant and urges that the trial court's judgment be reversed. Can there be any other meaning to what the PNC asserts on pages 44-45 of its brief? That kind of

subversion would turn neutral principles into a meaningless charade. There is no constitutional right to destroy the other side's very existence after the courts have resolved a disputed issue. Issue 3 should be overruled.

## PRAYER FOR RELIEF

The judgment should be affirmed.

Respectfully submitted,

BECK REDDEN LLP

By: */s/ David M. Gunn*
David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
Erin H. Huber
State Bar No. 24046118
ehuber@beckredden.clom
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

SUSMAN GODFREY L.L.P.
Thomas W. Paterson
State Bar No. 15571500
tpaterson@susmangodfrey.com
1000 Louisiana St., Suite 5100
Houston, TX 77002
(713) 651-9366
(713) 654-6666 (Fax)

**COUNSEL FOR APPELLEE, FIRST PRESBYTERIAN CHURCH OF HOUSTON**

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2015, a true and correct copy of the above and foregoing Brief of Appellee was forwarded to all counsel of record, by the Electronic Filing Service Provider if registered, otherwise by email, as follows:

Reagan M. Brown
reagan.brown@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney St., Suite 5100
Houston, TX  77010
(713) 651-5469
(713) 651-5246
***Counsel for Appellant***
***Presbytery of New Covenant, Inc.***


Kristin L. Smith
kristin.smith@bgllp.com
Tony L. Visage
tony.visage@bgllp.com
BRACEWELL & GIULIANI LLP
711 Louisiana St., Suite 2300
Houston, TX  77002
***Counsel for Presbyterian School***

Adam P. Schiffer
aschiffer@sohjlaw.com
Kenneth P. Held
kheld@sohjlaw.com
Penelope Nicholson
pnicholson@sohjlaw.com
SCHIFFER ODOM HICKS
  & JOHNSON PLLC
700 Louisiana St., Suite 2650
Houston, TX  77002
(713) 357-5150
(713) 357-5160 (Fax)
***Counsel for Appellant***
***Presbytery of New Covenant, Inc.***

*/s/ David M. Gunn*
David M. Gunn

# CERTIFICATE OF COMPLIANCE

1.	This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 14,015 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2)(B).

2.	This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated:  <u>September 23, 2015</u>.

<u>*/s/ David M. Gunn*</u>
David M. Gunn
*Counsel for Appellee*
*First Presbyterian Church of Houston*
